**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| LEXINGTON TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>TELEGRAM MESSENGER INC., TELEGRAM GROUP INC., and TELEGRAM FZ-LLC,<br><br>Defendants. | CIVIL ACTION NO. 2:26-cv-942<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Lexington Technologies, LLC files this Complaint against Defendants Telegram Messenger Inc., Telegram Group Inc., and Telegram FZ-LLC (collectively, "Telegram") for infringement of U.S. Patent No. 10,136,441 ("the '441 Patent"), U.S. Patent No. 11,240,816 ("the '816 Patent"), U.S. Patent No. 11,695,877 ("the '877 Patent"), U.S. Patent No. 11,800,018 ("the '018 Patent"), and U.S. Patent No. 12,432,304 ("the '304 Patent") (collectively, the "Asserted Patents").

## THE PARTIES

1. Plaintiff Lexington Technologies, LLC ("Lexington") is a Texas limited liability company located in Allen, Texas.

2. Defendant Telegram Messenger Inc. ("TMI") is a corporation organized and existing under the laws of the British Virgin Islands with its principal place of business in Dubai, United Arab Emirates and an office at Vista Corporate Services Centre, Wickhams Cay II, Road Town, British Virgin Islands, VG 1110. On information and belief, TMI conducts business as the provider and operator of Telegram products and services in the United States, the State of Texas,

and the Eastern District of Texas, directly or through intermediaries, subsidiaries, distributors, affiliates, agents, retailers, suppliers, integrators, customers, and others. TMI may be served with process through its registered agent, Conyers Trust Company (BVI) Limited, Commerce House, Wickhams Cay 1, P.O. Box 3140, Tortola, Road Town, VG1110, British Virgin Islands, and at Vista Corporate Services Centre, Wickhams Cay II, Road Town, British Virgin Islands, VG 1110.

3. Defendant Telegram Group Inc. ("TGI") is a corporation organized and existing under the laws of the British Virgin Islands with its principal place of business in Dubai, United Arab Emirates and an office at Vista Corporate Services Centre, Wickhams Cay II, Road Town, British Virgin Islands, VG 1110. On information and belief, TGI is the parent company of TMI and wholly owns TMI. On information and belief, TGI conducts business in the United States, the State of Texas, and the Eastern District of Texas, directly or through intermediaries, subsidiaries, distributors, affiliates, agents, retailers, suppliers, integrators, customers, and others. TGI may be served with process through its registered agent, Conyers Trust Company (BVI) Limited, Commerce House, Wickhams Cay 1, P.O. Box 3140, Tortola, Road Town, VG1110, British Virgin Islands, and at Vista Corporate Services Centre, Wickhams Cay II, Road Town, British Virgin Islands, VG 1110.

4. Defendant Telegram FZ-LLC ("TFZ") is a company organized and existing under the laws of the United Arab Emirates with offices at 3501, 3502, 3601, and 3602, Al Habtoor Business Tower, Marsa, Dubai, United Arab Emirates. On information and belief, TFZ is an indirect subsidiary of TGI. On information and belief, TFZ conducts business as the developer and distributor of Telegram products and services in the United States, the State of Texas, and the Eastern District of Texas, directly or through intermediaries, subsidiaries, distributors, affiliates, agents, retailers, suppliers, integrators, customers, and others.

5. Telegram is engaged in making, using, selling, offering for sale, and/or importing the Telegram communications platform, including its servers and applications providing messaging, voice calling, Live Location, and content delivery functionality ("Accused Products") to and throughout the United States, including this District. Telegram also induces its subsidiaries, distributors, affiliates, retailers, suppliers, integrators, and customers in the making, using, selling, offering for sale, and/or importing such products to and throughout the United States, including this District. To this end, Telegram and its foreign and U.S.-based subsidiaries—which act together as part of Telegram's global network of sales and distribution emissaries—have operated as agents of, and for, one another and have otherwise acted vicariously for Telegram as elements of the same business group and/or enterprise. Indeed, they work in concert and in orchestrated fashion, subject to agreements that are far nearer than arm's length, in order to implement a distribution channel of infringing products within this District and the United States.

6. On information and belief, Telegram owns, operates, controls, and/or uses server and network infrastructure located in the United States to provide Telegram products and services to users in the United States, including users in Texas and this District. *See, e.g.*, Decl. of Georgy Azarov ¶¶ 4-6, *QR Switch, LLC v. Telegram Group Inc.*, No. 2:26-cv-00254-JRG, Dkt. No. 10-1 (E.D. Tex. Aug. 17, 2026); https://ipinfo.io/149.154.175.50; https://telegram.org/privacy. Thus, Telegram maintains a physical presence in the United States.

7. Alone and through at least the activities of its subsidiaries, Telegram conducts business in the United States and this District, including making, distributing, and selling Accused Products that infringe the Asserted Patents. *See Trois v. Apple Tree Auction Center, Inc.*, 882 F.3d 485, 490 (5th Cir. 2018) ("A defendant may be subject to personal jurisdiction because of the activities of its agent within the forum state*…."); see also Cephalon, Inc. v. Watson*

*Pharmaceuticals, Inc.*, 629 F. Supp. 2d 338, 348 (D. Del. 2009) ("The agency theory may be applied not only to parents and subsidiaries, but also to companies that are 'two arms of the same business group,' operate in concert with each other, and enter into agreements with each other that are nearer than arm's length.").

**JURISDICTION AND VENUE**

8. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*., including, without limitation, 35 U.S.C. §§ 271, 281, 284, and 285. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9. This Court has specific and general personal jurisdiction over Defendants TMI and TFZ consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute because, among other things, TMI and TFZ individually (i) have engaged in continuous, systematic, and substantial business in Texas, and (ii) have committed and continue to commit, directly or through intermediaries (including subsidiaries, agents, distributors, affiliates, retailers, suppliers, integrators, customers, and others), acts of patent infringement in this State and this District. Such acts of infringement include making, using, testing, offering for sale, selling, and/or importing Accused Products (as more particularly identified and described throughout this Complaint) in this State and this District and/or inducing others to commit acts of patent infringement in this State and District. Indeed, TMI and TFZ each have purposefully and voluntarily placed, and are continuing to place, one or more Accused Products into the stream of commerce through established distribution channels (including the Internet) with the expectation and intent that such products will be sold to and purchased by consumers in the United States, this State, and this District; and with the knowledge and expectation that such products (whether in

standalone form or as integrated in downstream products) will be imported into the United States, this State, and this District.

10. TMI and TFZ have derived substantial revenues from their infringing acts occurring within this State and this District. TMI and TFZ each have substantial business in this State and this District, including (i) at least part of their infringing activities alleged herein and (ii) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from infringing goods and services offered for sale, sold, and imported, and goods and services provided to Texas residents vicariously through and/or in concert with each other and their agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers.

11. This Court has specific and personal jurisdiction over the Defendant TGI directly or through intermediaries (e.g., subsidiaries, distributors, affiliates, retailers, suppliers, integrators, customers, and others), including its subsidiaries, e.g., TMI and TFZ. Through direction and control of such subsidiaries, Defendant TGI has committed acts of direct and/or indirect patent infringement within this State and elsewhere within the United States giving rise to this action and/or has established minimum contacts with this forum such that the exercise of personal jurisdiction over Defendant TGI would not offend traditional notions of fair play and substantial justice. TMI is a wholly owned subsidiary of Defendant TGI and TFZ is an indirect subsidiary of Defendant TGI. The primary business of TMI is the marketing, support, and operation of Telegram products in the United States while the primary business of TFZ is the development and distribution of Telegram products in the United States. Upon information and belief, Defendant TGI compensates TMI and TFZ for marketing, support, operational, development, and distribution services in the United States. As such, Defendant TGI has a direct financial interest in its subsidiaries, and vice versa.

12. Defendant TGI controls and otherwise directs and authorizes all activities of its subsidiaries, including TMI and TFZ. Such directed and authorized activities include the subsidiaries using, offering for sale, selling, and/or importing the Accused Products, their components, and/or products containing the same that incorporate and/or perform the fundamental technologies covered by the Asserted Patents. Defendant TGI's subsidiaries (including TMI and TFZ) are expressly authorized to distribute, operate, offer to sell, and sell the Accused Products on behalf of Defendant TGI. For example, Defendant TGI contributes to research, design, and development of Accused Products (*see* https://www.scribd.com/document/443289602/Document-81-12, p. 69), and then directs its subsidiaries to distribute, offer for sale, and sell the Accused Products in the United States. *See, e.g., Semcon IP Inc. v. Kyocera Corp.*, No. 2:18-CV-00197-JRG, 2019 U.S. Dist. LEXIS 74904 (E.D. Tex. May 3, 2019). As another example, on information and belief, some TGI personnel hold dual roles that act as employees of TGI and other Telegram-related entities, including TFZ. *See* https://www.scribd.com/document/443289602/Document-81-12, p. 35; *see also* https://telegram.org/privacy (TMI sharing users' personal data with TGI). Defendant TGI's subsidiaries also provide, on Defendant TGI's behalf, operational, marketing, and technical support services for the Accused Products from their servers in the United States. For example, TMI helps maintain a website that advertises the Accused Products, including identifying the applications for which they can be used and providing related support. *See, e.g.*, https://telegram.org/. The referenced website also contains product documentation and other materials related to Defendant TGI's products. For example, the website includes an online customer support platform and blog articles providing documentation and instructions to end users. Thus, Defendant TGI's subsidiaries, including TMI and TFZ, are agents of TGI and conduct infringing activities on Defendant TGI's behalf.

13. On information and belief, because Defendant TGI's subsidiaries are authorized by Defendant TGI to distribute, offer to sell, and sell Accused Products and/or to perform the fundamental technologies covered by the Asserted Patents, Defendant TGI's subsidiaries' corporate presences in the United States give Defendant TGI substantially the same business advantages it would enjoy if it conducted its business through its own offices and personnel.

14. In addition, Telegram has knowingly induced, and continues to knowingly induce, infringements within this State and this District by advertising, marketing, offering for sale and/or selling Accused Products (as more particularly identified and described throughout this Complaint) that incorporate the fundamental technologies covered by the Asserted Patents. Such advertising, marketing, offering for sale and/or selling of Accused Products is directed to consumers, customers, manufacturers, integrators, suppliers, distributors, resellers, partners, and/or end users, and this includes providing instructions, user manuals, advertising, and/or marketing materials that facilitate, direct and encourage use of infringing functionality with Telegram's knowledge thereof.

15. Telegram intentionally distributes, provides, licenses, operates, and commercializes the Telegram communications platform to users throughout the United States, including users in Texas and this District. *See* https://sensortower.com/blog/2025-q4-unified-top-5-communication-apps-units-us-6070aae1241bc16eb81f5bab (showing Telegram has a substantial U.S. user/revenue base). For example, TFZ is identified as the developer and "Seller" of the Telegram application offered through application marketplaces and other U.S. distribution channels, through which Telegram offers paid products and services, including Telegram Premium and Telegram Stars, at prices denominated in U.S. dollars. *See, e.g.*, https://apps.apple.com/us/app/telegram-messenger/id686449807; https://play.google.com/store/apps/details?hl=en&id=org.telegram.messenger. On information

and belief, residents of Texas and this District have downloaded and licensed the Telegram applications through these distribution channels, purchased Telegram products and services, established Telegram accounts, and repeatedly accessed and used the Accused Products and accused functionality from within Texas and this District. Defendants knowingly and continuously provide the accused Telegram functionality to those Texas users through the Telegram applications and Telegram's cloud-based server infrastructure.

16. Telegram purposefully establishes continuing relationships with users of the Accused Products, including users in Texas and this District. Users who sign up for Telegram are required to accept Telegram's Terms of Service and Privacy Policy, and users who acquire Telegram's application receive a license to the application from its application provider. *See, e.g.*, https://telegram.org/tos; https://www.apple.com/legal/internet-services/itunes/dev/stdeula/. Telegram further enters into paid relationships with Telegram Premium users, who authorize recurring payments for their subscriptions. *See, e.g.*, https://telegram.org/tos; https://telegram.org/faq_premium/. In addition, Telegram is capable of deliberately serving geographically defined markets including markets within Texas and this District. *See, e.g.*, https://telegram.org/privacy ("ads can be shown in a particular country and city"). On information and belief, Telegram maintains such continuing user, licensing, and subscription relationships with residents of Texas and this District.

17. Telegram maintains actual and ongoing commercial relationships with users in Texas. Telegram acknowledges that it maintains group-level revenue data in the ordinary course of business that attributed Telegram revenue to Texas. *See QR Switch, LLC v. Telegram Group Inc.*, No. 2:26-cv-00254-JRG, Dkt. No. 35, pp. 1, 4, 10-11 (E.D. Tex. Oct. 08, 2026). Telegram

derives revenue from Texas users through, among other things, Telegram Premium subscriptions, Telegram Stars, and other paid Telegram products and services. *Id*.

18. Telegram purposefully communicates with users located in Texas as part of the ordinary operation of the Accused Products. To establish a Telegram account, a user provides Telegram a telephone number identifying the user's country and area code. *See QR Switch, LLC v. Telegram Group Inc.*, No. 2:26-cv-00254-JRG, Dkt. No. 35, pp. 2-3, 10-11 (E.D. Tex. Oct. 08, 2026). Telegram receives that information and sends authentication communications directly to the supplied telephone number, followed by additional communications between Telegram's servers and the user's device to authenticate the device and establish the account. *Id*.

19. Telegram specifically directs personnel and resources toward its United States operations. Telegram's own materials identify personnel with responsibility for "Compliance and Communications—United States and EU" and describe Telegram's cooperation with persons in the United States concerning compliance with United States laws and regulations. *See QR Switch, LLC v. Telegram Group Inc.*, No. 2:26-cv-00254-JRG, Dkt. No. 35, pp. 3-4 (E.D. Tex. Oct. 08, 2026).

20. Defendants TGI and TMI also maintain and operate physical server infrastructure in the United States. TGI and TMI acknowledged that they operate Telegram servers in Miami, Florida. *See* Decl. of Georgy Azarov ¶¶ 4-6, *QR Switch, LLC v. Telegram Group Inc.*, No. 2:26-cv-00254-JRG, Dkt. No. 10-1 (E.D. Tex. Aug. 17, 2026); *see also* https://ipinfo.io/149.154.175.50; https://telegram.org/privacy. Those U.S.-based servers support Telegram's cloud-based communications platform and provide further evidence that Telegram intentionally established infrastructure within the United States to provide Telegram services to U.S. users.

21. Telegram has established commercial channels specifically for the United States. In addition to distributing the Telegram applications through U.S. application marketplaces, Telegram has authorized Smart Glocal Services Inc., a Delaware corporation located in Wilmington, Delaware, to act as an authorized reseller under license from Telegram for Telegram Premium and Telegram Stars. *See* https://telegram.org/tos/third-party-payments. Telegram therefore deliberately uses U.S.-based commercial intermediaries to market and provide paid Telegram products and services to users in the United States.

22. Telegram users located in Texas and this District use the Accused Products to send and receive Telegram messages and media, make Telegram voice calls, download and receive media and other application data, communicate with Telegram's servers over Wi-Fi and cellular networks, and receive data and communications from those servers. In providing those functions to Texas users, Defendants cause the Telegram applications installed on devices located in Texas to communicate with and invoke functionality of Telegram's server-side systems.

23. Telegram has, in the multitude of ways described above, availed itself of the benefits and privileges of conducting business in this State and willingly subjected itself to the exercise of this Court's personal jurisdiction over it. Telegram also has sufficient minimum contacts with this forum through its transaction of substantial business in this State and this District and its commission of acts of patent infringement as alleged in this Complaint that are purposefully directed towards this State and District.

24. Alternatively, the Court maintains personal jurisdiction over each Defendant under Federal Rule of Civil Procedure 4(k)(2). Lexington's claims arise under federal patent law, and upon information and belief, Telegram has never identified another State in which it is subject to general jurisdiction. Telegram has extensive contacts with the United States as a whole, including

millions of United States users, distribution and commercialization of its applications through United States application marketplaces, paid subscription and other commercial relationships with United States users, geographically targeted advertising directed to United States markets, personnel specifically assigned responsibility for United States compliance and communications, and Telegram server infrastructure located in Miami, Florida.

25. Upon information and belief, each Defendant has sufficient minimum contacts with the forum because each Defendant transacts substantial business in the State of Texas and in this Judicial District. Further, each Defendant has, directly or through subsidiaries or intermediaries, committed and continues to commit acts of patent infringement in the State of Texas, and places its products and/or services, including those accused herein of infringement, into the stream of commerce with the expectation that they will reach this Judicial District, as alleged more particularly below. For example, upon information and belief, the Accused Products are available for purchase in this Judicial District. For further example, Defendants sell Accused Products, either directly or through intermediaries, to customers who use, sell, or offer for sale the Accused Products in this Judicial District.

26. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and (c) because each Defendant is a foreign company that may be sued in any Judicial District, including the Eastern District of Texas. Each Defendant is subject to personal jurisdiction in this Judicial District and has committed acts of patent infringement in this Judicial District. On information and belief, each Defendant through its own acts and/or through its subsidiaries, makes, uses, sells, and/or offers to sell infringing products within this Judicial District, regularly does and solicits business in this Judicial District, and has the requisite minimum contacts with the Judicial District, such that this venue is a fair and reasonable one.

**THE ASSERTED PATENTS AND TECHNOLOGY**

27. Lexington is the sole and exclusive owner of all right, title, and interest in the Asserted Patents and holds the exclusive right to take all actions necessary to enforce its rights in, and to, the Asserted Patents, including the filing of this patent infringement lawsuit. Indeed, Lexington owns all substantial rights in the Asserted Patents, including the right to exclude others and to recover damages for all past, present, and future infringements.

28. The '441 Patent is entitled, "Systems and methods of buffering application data operable at a delivery control server." The '441 Patent lawfully issued on November 20, 2018 and stems from U.S. Patent Application No. 14/485,700, which was filed on September 13, 2014.

29. The '816 Patent is entitled, "Distributed implementation of dynamic wireless traffic policy." The '816 Patent lawfully issued on February 1, 2022 and stems from U.S. Patent Application No. 16/919,873, which was filed on July 2, 2020.

30. The '877 Patent is entitled, "System and method for providing a network service in a distributed fashion to a mobile device." The '877 Patent lawfully issued on July 4, 2023 and stems from U.S. Patent Application No. 17/385,988, which was filed July 27, 2021.

31. The '018 Patent is entitled, "System and method for providing a network service in a distributed fashion to a mobile device." The '018 Patent lawfully issued on October 24, 2023 and stems from U.S. Patent Application No. 17/964,364, which was filed on October 12, 2022.

32. The '304 Patent is entitled, "System and method for providing a network service in a distributed fashion to a mobile device." The '304 Patent lawfully issued on September 30, 2025 and stems from U.S. Patent Application No. 18/406,731, which was filed on January 8, 2024.

33. The claims of the Asserted Patents are directed to patent-eligible subject matter under 35 U.S.C. § 101. They are not directed to an abstract idea, and the technologies covered by

the claims comprise systems and/or ordered combinations of features and functions that, at the time of invention, were not, alone or in combination, well-understood, routine, or conventional.

## DEFENDANTS' PRE-SUIT KNOWLEDGE OF INFRINGEMENT

34. Prior to filing this Complaint, Telegram was put on notice of its infringements of the Asserted Patents by way of communication with Lexington's licensing agent regarding a potential license to Lexington assets as early as October 1, 2026.

35. On October 1, 2026, Telegram received a letter via FedEx from Lexington via its licensing agent expressly informing Telegram that "the Telegram platform infringes numerous patents in Lexington's portfolio" and that Telegram therefore required a license to Lexington's patent portfolio. The letter further offered Telegram immediate access to a data room containing additional infringement materials that included claim charts for the Asserted Patents that evidenced and demonstrated Telegram's infringement and identified specific infringing Telegram functionality.

36. The accused products addressed in the Counts below include, but are not limited to, functionality identified in Lexington's communications to Telegram. Telegram's past and continuing sales of the accused products (i) willfully infringe the Asserted Patents, and (ii) impermissibly usurp the significant benefits of Lexington's patented technologies without fair compensation.

37. To the extent necessary, Lexington has complied with the requirements of 35 U.S.C. § 287, such that Lexington may recover pre-suit damages.

## COUNT I

(INFRINGEMENT OF U.S. PATENT NO. 10,136,441)

38. Lexington incorporates the preceding paragraphs herein by reference.

39. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. § 271, *et seq*.

40. Lexington is the owner of all substantial rights, title, and interest in and to the ’441 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

41. The ’441 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on November 20, 2018, after full and fair examination.

***Direct Infringement (35 U.S.C. § 271(a))***

42. Telegram directly infringes one or more claims of the ’441 Patent in this District and elsewhere in Texas and the United States under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing Telegram applications providing content delivery services that incorporate the fundamental technologies covered by the ’441 Patent, including, but not limited to, the Telegram client applications for Android, iOS, Windows, Linux, macOS, and web browsers (e.g., the Telegram iOS client application (version 12.9.4)) (collectively, “the ’441 Accused Products”).

43. Telegram directly infringes at least claim 4 of the ’441 Patent, including through TFZ’s direct infringement and TGI’s direct infringement through TFZ acting as TGI’s agent and on TGI’s behalf, by using, practicing, and/or performing (including via testing) the methods claimed by the ’441 Patent.

44. By way of illustration only, Telegram’s ’441 Accused Products comprise each and every element of claim 4 of the ’441 Patent. The ’441 Accused Products perform “[a] method of buffering application data operable at a mobile device.” For example, the ’441 Accused Products buffer application data (e.g., photos) operable at a mobile device based on mobile device activity.




Source: https://apps.apple.com/us/app/telegram-messenger/id686449807

**Viewing Media**

Telegram supports four kinds of attachments: photos, videos, documents and locations. Photos, videos and documents need to be downloaded before they can be viewed. Photos are downloaded automatically once the user starts viewing the chat, and the downloading of videos and documents is initiated explicitly by a tap on the content (this behaviour can be changed by the user in the Settings section).

Source: https://core.telegram.org/blackberry/chat-media-view




Source: Screenshot of Telegram iOS Client Application (version 12.9.4)

45. The ’441 Accused Products perform a method comprising “transmitting information that identifies applications used by the mobile device to a delivery control server.” For example, the ’441 Accused Products transmit information that identifies applications (e.g., app identifiers and version numbers) to a delivery control server.




Source: https://core.telegram.org/method/initConnection




Source: Screenshot of Telegram iOS Client Application (version 12.9.4)

46. The ’441 Accused Products perform a method comprising “transmitting a request to buffer application data for the identified applications to the delivery control server, wherein buffering application data conserves signaling bandwidth.” For example, the ’441 Accused Products send a message to the server to buffer application data (e.g., photos) when a user is inactive and/or not viewing a chat message feed, wherein signaling bandwidth is conserved because photos are not downloaded until the user views a chat message feed, reducing unnecessary data transmission.

### Viewing Media

Telegram supports four kinds of attachments: photos, videos, documents and locations. Photos, videos and documents need to be downloaded before they can be viewed. Photos are downloaded automatically once the user starts viewing the chat, and the downloading of videos and documents is initiated explicitly by a tap on the content (this behaviour can be changed by the user in the Settings section).

Source: https://core.telegram.org/blackberry/chat-media-view

## What is Lazy Loading?

Lazy loading is a design pattern that delays the loading of resources until they are actually needed. Instead of loading all data upfront when the app starts, only the visible or immediately required content is loaded first. Additional data is fetched as the user interacts with the app, such as scrolling through a list.

For example, in a social media app, images and posts are loaded only when they come into the user’s view. This reduces initial load time and improves app responsiveness.

## Benefits of Lazy Loading

- **Improved Performance:** Reduces initial loading time by loading only necessary data.
- **Lower Memory Usage:** Minimizes memory consumption by avoiding unnecessary data loading.
- **Better User Experience:** Ensures smoother scrolling and faster interactions.
- **Efficient Network Usage:** Loads data only when required, saving bandwidth.

Source: https://www.daydreamsoft.com/blog/lazy-loading-and-pagination-in-mobile-applications-boost-performance-and-user-experience

47. The ’441 Accused Products perform a method comprising “detecting user activity at the mobile device.” For example, the ’441 Accused Products monitor and detect user activity at the mobile device, e.g., when a user starts viewing a chat message feed.

> **Viewing Media**
>
> Telegram supports four kinds of attachments: photos, videos, documents and locations. Photos, videos and documents need to be downloaded before they can be viewed. Photos are downloaded automatically once the user starts viewing the chat, and the downloading of videos and documents is initiated explicitly by a tap on the content (this behaviour can be changed by the user in the Settings section).

Source: https://core.telegram.org/blackberry/chat-media-view




Source: Screenshot of Telegram iOS Client Application (version 12.9.4)

48. The ’441 Accused Products perform a method comprising “transmitting an activity notification to the delivery control server upon detecting the user activity at the mobile device.” For example, the ’441 Accused Products transmit an activity notification to a server upon detecting user activity.

## openChat Class Reference final

List of all members | Public Fields | Public Types | Public Instance Methods | Static Public Attributes

Inherits **Function**.

### Description

Informs TDLib that the chat is opened by the user. Many useful activities depend on the chat being opened or closed (e.g., in supergroups and channels all updates are received only for opened chats).

Returns object_ptr<Ok>.

Source: https://core.telegram.org/tdlib/docs/classtd_1_1td__api_1_1open_chat.html




Source: Screenshot of Telegram iOS Client Application (version 12.9.4)

49. The '441 Accused Products perform a method comprising "receiving buffered application data for at least one of the identified applications from the deliver control server in

response to transmitting the activity notification." For example, the '441 Accused Products receive the buffered application data (e.g., photos) from the delivery control server in response to transmitting the activity notification.

> **Viewing Media**
>
> Telegram supports four kinds of attachments: photos, videos, documents and locations. Photos, videos and documents need to be downloaded before they can be viewed. Photos are downloaded automatically once the user starts viewing the chat, and the downloading of videos and documents is initiated explicitly by a tap on the content (this behaviour can be changed by the user in the Settings section).

Source: https://core.telegram.org/blackberry/chat-media-view




Source: Screenshot of Telegram iOS Client Application (version 12.9.4)

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

50. In addition and/or in the alternative to the direct infringements, Telegram indirectly infringes one or more claims of the '441 Patent under U.S.C. § 271(b) by knowingly and intentionally inducing others to directly infringe the '441 Patent (e.g., by using '441 Accused Products in a manner that practices one or more claims of the '441 Patent). Such induced direct

infringers include Telegram's customers and/or other end users, as well as TFZ, to the extent TFZ's infringing acts are not attributable to TGI for purposes of direct infringement.

51. At a minimum, Telegram has had knowledge of the '441 Patent at least since service of this Complaint. Telegram also has knowledge of the '441 Patent since receiving detailed correspondence from Lexington prior to the filing of the Complaint, alerting Telegram to its infringements. Since receiving notice of its infringements, Telegram has actively induced, and continues to actively induce, the direct infringements of its customers and/or other end users (e.g., as illustrated above) as set forth under U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the '441 Patent. Indeed, Telegram has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the Accused Products, including marketing materials, user manuals, and online instructional materials (e.g., those available via https://telegram.org) that specifically teach and encourage customers and other end users to use the '441 Accused Products in an infringing manner, including by providing instructions on how to use '441 Accused Products. By providing such instructions and support, Telegram knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the '441 Patent.

***Damages***

52. Lexington has been damaged as a result of Telegram's infringing conduct described in this Count. Telegram is, thus, liable to Lexington in an amount that adequately compensates it

for Telegram's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

53. Despite having knowledge of the '441 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the '441 Patent, Telegram has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Telegram's infringing activities relative to the '441 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of Lexington's rights with respect to the '441 Patent, justifying enhanced damages under 35 U.S.C. § 284.

**COUNT II**

(INFRINGEMENT OF U.S. PATENT NO. 11,240,816)

54. Lexington incorporates the preceding paragraphs herein by reference.

55. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. § 271, *et seq*.

56. Lexington is the owner of all substantial rights, title, and interest in and to the '816 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

57. The '816 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on February 1, 2022, after full and fair examination.

***Direct Infringement (35 U.S.C. § 271(a))***

58. Telegram directly infringes one or more claims of the '816 Patent in this District and elsewhere in Texas and the United States under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing Telegram applications providing content delivery services that incorporate the fundamental technologies covered by the '816 Patent, including, but not limited to, the Telegram client applications for Android, iOS, Windows, Linux, macOS, and web browsers

(e.g., the Telegram iOS client application (version 12.9.4)) (collectively, "the '816 Accused Products").

59. Telegram directly infringes at least claim 4 of the '816 Patent, including through TFZ's direct infringement and TGI's direct infringement through TFZ acting as TGI's agent and on TGI's behalf, by using, practicing, and/or performing (including via testing) the methods claimed by the '816 Patent.

60. By way of illustration only, Telegram's '816 Accused Products comprise each and every element of claim 4 of the '816 Patent. The '816 Accused Products perform "[a] method of buffering application data operable at a mobile device." For example, the '816 Accused Products buffer application data (e.g., photos) operable at a mobile device based on mobile device activity.




Source: https://apps.apple.com/us/app/telegram-messenger/id686449807

**Viewing Media**

Telegram supports four kinds of attachments: photos, videos, documents and locations. Photos, videos and documents need to be downloaded before they can be viewed. Photos are downloaded automatically once the user starts viewing the chat, and the downloading of videos and documents is initiated explicitly by a tap on the content (this behaviour can be changed by the user in the Settings section).

Source: https://core.telegram.org/blackberry/chat-media-view




Source: Screenshot of Telegram iOS Client Application (version 12.9.4)

61. The ’816 Accused Products perform a method comprising “transmitting information that identifies applications used by the mobile device to a delivery control server.” For example, the ’816 Accused Products transmit information that identifies applications (e.g., app identifiers and version numbers) to a delivery control server.



| | | |
|---|---|---|
| api_id | int | Application identifier (see. App configuration) |

| | | |
|---|---|---|
| app_version | string | Application version |

Source: https://core.telegram.org/method/initConnection




Source: Screenshot of Telegram iOS Client Application (version 12.9.4)

62. The ’816 Accused Products perform a method comprising “transmitting a request to buffer application data for the identified applications to the delivery control server, wherein buffering application data conserves signaling bandwidth.” For example, the ’816 Accused Products send a message to the server to buffer application data (e.g., photos) when a user is inactive and/or not viewing a chat message feed, wherein signaling bandwidth is conserved because photos are not downloaded until the user views a chat message feed, reducing unnecessary data transmission.

**Viewing Media**

Telegram supports four kinds of attachments: photos, videos, documents and locations. Photos, videos and documents need to be downloaded before they can be viewed. Photos are downloaded automatically once the user starts viewing the chat, and the downloading of videos and documents is initiated explicitly by a tap on the content (this behaviour can be changed by the user in the Settings section).

Source: https://core.telegram.org/blackberry/chat-media-view

## What is Lazy Loading?

Lazy loading is a design pattern that delays the loading of resources until they are actually needed. Instead of loading all data upfront when the app starts, only the visible or immediately required content is loaded first. Additional data is fetched as the user interacts with the app, such as scrolling through a list.

For example, in a social media app, images and posts are loaded only when they come into the user's view. This reduces initial load time and improves app responsiveness.

## Benefits of Lazy Loading

- **Improved Performance:** Reduces initial loading time by loading only necessary data.
- **Lower Memory Usage:** Minimizes memory consumption by avoiding unnecessary data loading.
- **Better User Experience:** Ensures smoother scrolling and faster interactions.
- **Efficient Network Usage:** Loads data only when required, saving bandwidth.

Source: https://www.daydreamsoft.com/blog/lazy-loading-and-pagination-in-mobile-applications-boost-performance-and-user-experience

63. The '816 Accused Products perform a method comprising transmitting a request "wherein transmitting the request to buffer application data is based on inactivity of the mobile device." For example, the '816 Accused Products detect activity at the mobile device and transmit a request to buffer data when the device becomes inactive (e.g., when the chat message feed is no longer open or being viewed by the user).

### Viewing Media

Telegram supports four kinds of attachments: photos, videos, documents and locations. Photos, videos and documents need to be downloaded before they can be viewed. Photos are downloaded automatically once the user starts viewing the chat, and the downloading of videos and documents is initiated explicitly by a tap on the content (this behaviour can be changed by the user in the Settings section).

Source: https://core.telegram.org/blackberry/chat-media-view

## openChat Class Reference final

List of all members | Public Fields | Public Types | Public Instance Methods | Static Public Attributes

Inherits **Function**.

### Description

Informs TDLib that the chat is opened by the user. Many useful activities depend on the chat being opened or closed (e.g., in supergroups and channels all updates are received only for opened chats).

Returns object_ptr<Ok>.

Source: https://core.telegram.org/tdlib/docs/classtd_1_1td__api_1_1open_chat.html

64. The '816 Accused Products perform a method comprising "detecting user activity at the mobile device." For example, the '816 Accused Products monitor and detect user activity at the mobile device, e.g., when a user starts viewing a chat message feed.

### Viewing Media

Telegram supports four kinds of attachments: photos, videos, documents and locations. Photos, videos and documents need to be downloaded before they can be viewed. Photos are downloaded automatically once the user starts viewing the chat, and the downloading of videos and documents is initiated explicitly by a tap on the content (this behaviour can be changed by the user in the Settings section).

Source: https://core.telegram.org/blackberry/chat-media-view




Source: Screenshot of Telegram iOS Client Application (version 12.9.4)

65. The '816 Accused Products perform a method comprising "transmitting an activity notification to the delivery control server upon detecting the user activity at the mobile device." For example, the '816 Accused Products transmit an activity notification to a server upon detecting user activity.

## openChat Class Reference final

List of all members | Public Fields | Public Types | Public Instance Methods | Static Public Attributes

Inherits **Function**.

### Description

Informs TDLib that the chat is opened by the user. Many useful activities depend on the chat being opened or closed (e.g., in supergroups and channels all updates are received only for opened chats).

Returns object_ptr<Ok>.

Source: https://core.telegram.org/tdlib/docs/classtd_1_1td__api_1_1open_chat.html




Source: Screenshot of Telegram iOS Client Application (version 12.9.4)

66. The ’816 Accused Products perform a method comprising “receiving buffered application data for at least one of the identified applications from the deliver control server in

response to transmitting the activity notification." For example, the '816 Accused Products receive the buffered application data (e.g., photos) from the delivery control server in response to transmitting the activity notification.

> **Viewing Media**
>
> Telegram supports four kinds of attachments: photos, videos, documents and locations. Photos, videos and documents need to be downloaded before they can be viewed. Photos are downloaded automatically once the user starts viewing the chat, and the downloading of videos and documents is initiated explicitly by a tap on the content (this behaviour can be changed by the user in the Settings section).

Source: https://core.telegram.org/blackberry/chat-media-view




Source: Screenshot of Telegram iOS Client Application (version 12.9.4)

67. The '816 Accused Products perform a method comprising receiving buffered application data "wherein receiving the buffered application data includes receiving a notification message targeted to the mobile device." For example, the '816 Accused Products' buffered application data also includes a notification message targeted to the mobile device.




Source: Screenshot of a Notification from Telegram iOS Client Application (version 12.9.4)

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

68. In addition and/or in the alternative to the direct infringements, Telegram indirectly infringes one or more claims of the ’816 Patent under U.S.C. § 271(b) by knowingly and intentionally inducing others to directly infringe the ’816 Patent (e.g., by using ’816 Accused Products in a manner that practices one or more claims of the ’816 Patent). Such induced direct infringers include Telegram’s customers and/or other end users, as well as TFZ, to the extent TFZ’s infringing acts are not attributable to TGI for purposes of direct infringement.

69. At a minimum, Telegram has had knowledge of the ’816 Patent at least since service of this Complaint. Telegram also has knowledge of the ’816 Patent since receiving detailed correspondence from Lexington prior to the filing of the Complaint, alerting Telegram to its infringements. Since receiving notice of its infringements, Telegram has actively induced, and

continues to actively induce, the direct infringements of its customers and/or other end users (e.g., as illustrated above) as set forth under U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the ’816 Patent. Indeed, Telegram has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the Accused Products, including marketing materials, user manuals, and online instructional materials (e.g., those available via https://telegram.org) that specifically teach and encourage customers and other end users to use the ’816 Accused Products in an infringing manner, including by providing instructions on how to use ’816 Accused Products. By providing such instructions and support, Telegram knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the ’816 Patent.

***Damages***

70. Lexington has been damaged as a result of Telegram’s infringing conduct described in this Count. Telegram is, thus, liable to Lexington in an amount that adequately compensates it for Telegram’s infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

71. Despite having knowledge of the ’816 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the ’816 Patent, Telegram has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Telegram’s infringing activities relative to the ’816 Patent have, thus, been, and continue to be, willful, wanton,

and deliberate in disregard of Lexington's rights with respect to the '816 Patent, justifying enhanced damages under 35 U.S.C. § 284.

**COUNT III**

(INFRINGEMENT OF U.S. PATENT NO. 11,695,877)

72. Lexington incorporates the preceding paragraphs herein by reference.

73. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. § 271, *et seq*.

74. Lexington is the owner of all substantial rights, title, and interest in and to the '877 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

75. The '877 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on July 4, 2023, after full and fair examination.

***Direct Infringement (35 U.S.C. § 271(a))***

76. Telegram directly infringes one or more claims of the '877 Patent in this District and elsewhere in Texas and the United States under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing the Telegram communications platform, including its servers and applications providing messaging and voice calling services that incorporate the fundamental technologies covered by the '877 Patent (collectively, "the '877 Accused Products").

77. Telegram directly infringes at least claim 1 of the '877 Patent, including through TMI's direct infringement and TGI's direct infringement through TMI acting as TGI's agent and on TGI's behalf, by making, using, selling, offering to sell, and/or importing the systems claimed by the '877 Patent.

78. By way of illustration only, Telegram's '877 Accused Products comprise each and every element of claim 1 of the '877 Patent. The '877 Accused Products comprise "[a] system for

providing communication services, the system having a memory and one or more processors." For example, the '877 Accused Products have servers with memory and processor(s) that provide communication services.




Source: https://adevcan.com/privacy/telegram-review/

**3.3.1. Cloud Chats**

Telegram is a cloud service. We store messages, photos, videos and documents from your *cloud chats* on our servers so that you can access your data from any of your devices anytime without having to rely on third-party backups. All data is stored heavily encrypted and the encryption keys in each case are stored in several other data centers in different jurisdictions. This way local engineers or physical intruders cannot get access to user data.

**4.1. Storing Data**

If you signed up for Telegram from the UK or the EEA, your data is stored in data centers in the Netherlands. These are third-party provided data centers in which Telegram rents a designated space. However, the servers and networks that sit inside these data centers and on which your personal data is stored are owned by Telegram. As such, we do not share your personal data with such data centers. All data is stored heavily encrypted so that local Telegram engineers or physical intruders cannot get access.

Source: https://telegram.org/privacy

79. The '877 Accused Products comprise a system configured to "receive a unique authentication token from a first device." For example, the '877 Accused Products receive a unique authentication token from a user's mobile device when the user logs in to the Telegram app.

**Future auth tokens**

When invoking auth.logOut on a previously authorized session, the server may return a `future_auth_token`, which should be stored in the local database.

A `future_auth_token` is also contained in the auth.authorization returned when logging in.

At all times, the future auth token database should contain at most 20 tokens: evict older tokens as new tokens are added to stay below this limit.

When invoking auth.sendCode, all future auth tokens present in the database should be provided to `codeSettings.logout_tokens`.

If any of the future auth tokens matches the account we're trying to login into and the token hasn't expired:

- If 2FA is not enabled, auth.sendCode will directly return an auth.sentCodeSuccess constructor with session info, indicating the session is authorized.
- If 2FA is enabled, auth.sendCode will return a `SESSION_PASSWORD_NEEDED` RPC error, asking the user to enter the 2FA password, without sending any authorization code.

Source: https://core.telegram.org/api/auth#future-auth-tokens

80. The ’877 Accused Products comprise a system configured to “provide the communication services to the first device, wherein the communication services are associated with the unique authentication token and branded by a provider of the communication services that is other than a provider of a mobile network.” For example, the ’877 Accused Products provide voice call and messaging services to a user’s mobile device, both of which are associated with the unique authentication token since the user must be authenticated via the token to enable the voice call and messaging services. The provider of the communications services, Telegram, is not a mobile network provider.



Source: https://apps.apple.com/us/app/telegram-messenger/id686449807

**Q: What is Telegram? What do I do here?**

Telegram is a messaging app with a focus on speed and security, it's super-fast, simple and free. You can use Telegram on all your devices **at the same time** — your messages sync seamlessly across any number of your phones, tablets or computers. Telegram is one of the **top 5 most downloaded apps** in the world with over **1 billion** active users.

With Telegram, you can send messages, photos, videos and **files** of any type (doc, zip, mp3, etc), as well as create groups for up to **200,000** people or **channels** for broadcasting to **unlimited** audiences. You can write to your phone contacts and find people by their **usernames**. As a result, Telegram is like SMS and email combined — and can take care of all your personal or business messaging needs. We also support end-to-end encrypted **voice** and **video calls**, **group calls** for up to 200 participants, and **voice chats** in groups that members can join whenever they want.

Source: https://telegram.org/faq






Source: Screenshots of Telegram iOS Client Application

81. The '877 Accused Products comprise a system "wherein the first device includes application software for allowing the communication services, wherein the application software is branded by the provider of the communication services." For example, Telegram includes application software (e.g., Telegram app) for allowing voice calls and messaging that interfaces with the '877 Accused Products.




Source: https://apps.apple.com/us/app/telegram-messenger/id686449807

**Q: What is Telegram? What do I do here?**

Telegram is a messaging app with a focus on speed and security, it's super-fast, simple and free. You can use Telegram on all your devices **at the same time** — your messages sync seamlessly across any number of your phones, tablets or computers. Telegram is one of the **top 5 most downloaded apps** in the world with over **1 billion** active users.

With Telegram, you can send messages, photos, videos and **files** of any type (doc, zip, mp3, etc), as well as create groups for up to **200,000** people or **channels** for broadcasting to **unlimited** audiences. You can write to your phone contacts and find people by their **usernames**. As a result, Telegram is like SMS and email combined — and can take care of all your personal or business messaging needs. We also support end-to-end encrypted **voice and video calls**, **group calls** for up to 200 participants, and **voice chats** in groups that members can join whenever they want.

Source: https://telegram.org/faq

82. The ’877 Accused Products comprise a system “wherein an identifier associated with the first device is stored by the provider of the communication services and the provider of the mobile network, wherein the communication services are associated with the identifier; wherein the identifier is a phone number associated with the first device.” For example, the phone number of a user’s mobile device is stored by both the ’877 Accused Products and the user’s mobile network provider. The voice call and messaging services are associated with the phone number via the user’s profile information.

**3.4. Phone Number and Contacts**

Telegram uses phone numbers as unique identifiers so that it is easy for you to switch from SMS and other messaging apps and retain your social graph. We ask your permission before syncing your contacts.

We store your up-to-date contacts in order to notify you as soon as one of your contacts signs up for Telegram and to properly display names in notifications. We only need the number and name (first and last) for this to work and store no other data about your contacts.

Our automatic algorithms can also use anonymized sets of phone numbers to calculate the approximate number of potential contacts an unregistered phone number may have on Telegram. When you open the 'Invite friends' interface, we display the resulting statistics next to your contacts to give you an idea of who could benefit most from joining Telegram.

Source: https://telegram.org/privacy

83. The ’877 Accused Products comprise a system configured to “provide the communication services to the first device through each of a Wi-Fi network and the mobile network.” For example, the ’877 Accused Products’ services including voice calls and messaging are provided through both Wi-Fi networks and mobile networks.

> These parameters can also be adjusted during a conversation if there's a change in your connection. Telegram will adapt and provide excellent sound quality on stable WiFi — or use less data when you walk into a refrigerator with bad reception.

Source: https://telegram.org/blog/calls?setln=pl




Source: https://translations.telegram.org/en/ios/general/Permissions.CellularDataText.v0

84. The ’877 Accused Products comprise a system “wherein the communication services include a user generated message that is generated at the first device for transmission to a second device.” For example, the ’877 Accused Products allow a user to generate a message for transmission to a second device.

**Q: Who can contact me?**

People can contact you on Telegram if they **know your phone number** or if you **message them first**.

If they don't know your phone number, they can find you in these cases:

- When you both are members of the **same group**.
- If you set a **public username**. Others can use **Global Search** and find you by your username.

**Q: What do the check marks mean?**

*One check* — message delivered to the Telegram cloud and your friend has been notified if he allows notifications.
*Two checks* — message read (your friend opened Telegram and opened the conversation with the message).

We don't have a 'delivered to device' status for messages because Telegram can run on as many devices as you want. So which particular one would that check mean?

Source: https://telegram.org/faq




Source: Screenshot of Telegram iOS Client Application

85. The ’877 Accused Products comprise a system configured to “monitor availability of a user of the second device, wherein the availability is related to the communication services.” For example, the ’877 Accused Products monitor the availability of a user (e.g., activity status) of the second device as part of the messaging functionality.

**Q: Can I hide my 'last seen' time?**

You can choose who sees this info in Privacy and Security settings.

Remember that you won't see Last Seen timestamps for people with whom you don't share your own. You will, however, see an approximate last seen value. This keeps stalkers away but makes it possible to understand whether a person is reachable over Telegram. There are four possible approximate values:

- **Last seen recently** — covers anything between 1 second and 2-3 days
- **Last seen within a week** — between 2-3 and seven days
- **Last seen within a month** — between 6-7 days and a month
- **Last seen a long time ago** — more than a month (this is also always shown to blocked users)

**Q: Who can see me 'online'?**

The last seen rules apply to your online status as well. People can only see you online if you're sharing your last seen status with them.

There are some exceptions because sometimes it is obvious that you are online. Regardless of the last seen settings, people will see you online for a brief period (~30 seconds) if you do the following:

- Send them a message in a one-on-one chat or in a group where you both are members.
- Read a message they sent you in a one-on-one chat.
- Broadcast a "typing..." status to their chat with you or to a group where you both are members.

Source: https://telegram.org/faq

86. The '877 Accused Products comprise a system configured to "cause to display, on the first device, an indication of the monitored availability." For example, the '877 Accused Products cause to display on the first device an indication of activity status (e.g., online or last seen timestamp) of the second device.

**Q: Can I hide my 'last seen' time?**

You can choose who sees this info in Privacy and Security settings.

Remember that you won't see Last Seen timestamps for people with whom you don't share your own. You will, however, see an approximate last seen value. This keeps stalkers away but makes it possible to understand whether a person is reachable over Telegram. There are four possible approximate values:

- **Last seen recently** — covers anything between 1 second and 2-3 days
- **Last seen within a week** — between 2-3 and seven days
- **Last seen within a month** — between 6-7 days and a month
- **Last seen a long time ago** — more than a month (this is also always shown to blocked users)

**Q: Who can see me 'online'?**

The last seen rules apply to your online status as well. People can only see you online if you're sharing your last seen status with them.

There are some exceptions because sometimes it is obvious that you are online. Regardless of the last seen settings, people will see you online for a brief period (~30 seconds) if you do the following:

- Send them a message in a one-on-one chat or in a group where you both are members.
- Read a message they sent you in a one-on-one chat.
- Broadcast a "typing..." status to their chat with you or to a group where you both are members.

Source: https://telegram.org/faq



Source: Screenshot of Telegram iOS Client Application

87. The ’877 Accused Products comprise a system configured to “send the user generated message to the second device based on receiving the user generated message from the first device.” For example, the ’877 Accused Products receive a message generated on the first device intended for the second device and send that message to the second device.

**Q: Who can contact me?**

People can contact you on Telegram if they **know your phone number** or if you **message them first.**

If they don't know your phone number, they can find you in these cases:

- When you both are members of the **same group**.
- If you set a **public username**. Others can use **Global Search** and find you by your username.

**Q: What do the check marks mean?**

*One check* — message delivered to the Telegram cloud and your friend has been notified if he allows notifications.
*Two checks* — message read (your friend opened Telegram and opened the conversation with the message).

We don't have a 'delivered to device' status for messages because Telegram can run on as many devices as you want. So which particular one would that check mean?

Source: https://telegram.org/faq




Source: Screenshot of Telegram iOS Client Application

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

88. In addition and/or in the alternative to the direct infringements, Telegram indirectly infringes one or more claims of the ’877 Patent under U.S.C. § 271(b) by knowingly and intentionally inducing others to directly infringe the ’877 Patent (e.g., by using ’877 Accused Products in a manner that practices one or more claims of the ’877 Patent). Such induced direct infringers include Telegram’s customers and/or other end users, as well as TMI, to the extent TMI’s infringing acts are not attributable to TGI for purposes of direct infringement.

89. At a minimum, Telegram has had knowledge of the ’877 Patent at least since service of this Complaint. Telegram also has knowledge of the ’877 Patent since receiving detailed correspondence from Lexington prior to the filing of the Complaint, alerting Telegram to its infringements. Since receiving notice of its infringements, Telegram has actively induced, and

continues to actively induce, the direct infringements of its customers and/or other end users (e.g., as illustrated above) as set forth under U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the ’877 Patent. Indeed, Telegram has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the Accused Products, including marketing materials, user manuals, and online instructional materials (e.g., those available via https://telegram.org) that specifically teach and encourage customers and other end users to use the ’877 Accused Products in an infringing manner, including by providing instructions on how to use ’877 Accused Products. By providing such instructions and support, Telegram knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the ’877 Patent.

***Damages***

90. Lexington has been damaged as a result of Telegram’s infringing conduct described in this Count. Telegram is, thus, liable to Lexington in an amount that adequately compensates it for Telegram’s infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

91. Despite having knowledge of the ’877 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the ’877 Patent, Telegram has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Telegram’s infringing activities relative to the ’877 Patent have, thus, been, and continue to be, willful, wanton,

and deliberate in disregard of Lexington's rights with respect to the '877 Patent, justifying enhanced damages under 35 U.S.C. § 284.

**<u>COUNT IV</u>**

(INFRINGEMENT OF U.S. PATENT NO. 11,800,018)

92. Lexington incorporates the preceding paragraphs herein by reference.

93. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. § 271, *et seq*.

94. Lexington is the owner of all substantial rights, title, and interest in and to the '018 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

95. The '018 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on October 24, 2023, after full and fair examination.

***Direct Infringement (35 U.S.C. § 271(a))***

96. Telegram directly infringes one or more claims of the '018 Patent in this District and elsewhere in Texas and the United States under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing the Telegram communications platform, including its servers and applications providing messaging and Live Location services that incorporate the fundamental technologies covered by the '018 Patent (collectively, "the '018 Accused Products").

97. Telegram directly infringes at least claim 1 of the '018 Patent, including through TMI's direct infringement and TGI's direct infringement through TMI acting as TGI's agent and on TGI's behalf, by making, using, selling, offering to sell, and/or importing the systems claimed by the '018 Patent.

98. By way of illustration only, Telegram's '018 Accused Products comprise each and every element of claim 1 of the '018 Patent. The '018 Accused Products comprise "[a] system

having a memory and one or more processors." For example, the '018 Accused Products have servers with memory and processor(s) that provide messaging and Live Location services.




Source: https://adevcan.com/privacy/telegram-review/

**3.3.1. Cloud Chats**

Telegram is a cloud service. We store messages, photos, videos and documents from your *cloud chats* on our servers so that you can access your data from any of your devices anytime without having to rely on third-party backups. All data is stored heavily encrypted and the encryption keys in each case are stored in several other data centers in different jurisdictions. This way local engineers or physical intruders cannot get access to user data.

**4.1. Storing Data**

If you signed up for Telegram from the UK or the EEA, your data is stored in data centers in the Netherlands. These are third-party provided data centers in which Telegram rents a designated space. However, the servers and networks that sit inside these data centers and on which your personal data is stored are owned by Telegram. As such, we do not share your personal data with such data centers. All data is stored heavily encrypted so that local Telegram engineers or physical intruders cannot get access.

### 3.5. Location Data

If you share a location in a chat, this location data is treated like other messages in cloud or secret chats respectively.

If you share your Live Location in any chat or turn on *'Make Myself Visible'* in People Nearby, Telegram will use your data to display your location to those users with whom you are sharing it, even when the app is closed – for as long as you keep these optional features activated.

Source: https://telegram.org/privacy

99. The '018 Accused Products comprise a system configured to "receive a unique authentication token from a first device, wherein the first device is an end user device." For example, the '018 Accused Products receive a unique authentication token from a user's mobile device when the user logs in to the Telegram app.

**Future auth tokens**

When invoking auth.logOut on a previously authorized session, the server may return a `future_auth_token`, which should be stored in the local database.
A `future_auth_token` is also contained in the auth.authorization returned when logging in.
At all times, the future auth token database should contain at most 20 tokens: evict older tokens as new tokens are added to stay below this limit.
When invoking auth.sendCode, all future auth tokens present in the database should be provided to `codeSettings.logout_tokens`.
If any of the future auth tokens matches the account we're trying to login into and the token hasn't expired:

- If 2FA is not enabled, auth.sendCode will directly return an auth.sentCodeSuccess constructor with session info, indicating the session is authorized.
- If 2FA is enabled, auth.sendCode will return a `SESSION_PASSWORD_NEEDED` RPC error, asking the user to enter the 2FA password, without sending any authorization code.

Source: https://core.telegram.org/api/auth#future-auth-tokens

100. The '018 Accused Products comprise a system configured to "provide application data services for the first device, wherein the application data services are associated with the unique authentication token and branded by a provider of the application data services that is other

than a provider of a mobile network." For example, the '018 Accused Products provide messaging and Live Location services to a user's mobile device, which is associated with the unique authentication token since the user must be authenticated via the token to enable the messaging and Live Location services. The provider of the application data services, Telegram, is not a mobile network provider.




Source: https://apps.apple.com/us/app/telegram-messenger/id686449807

**Q: What is Telegram? What do I do here?**

Telegram is a messaging app with a focus on speed and security, it's super-fast, simple and free. You can use Telegram on all your devices **at the same time** — your messages sync seamlessly across any number of your phones, tablets or computers. Telegram is one of the **top 5 most downloaded apps** in the world with over **1 billion** active users.

With Telegram, you can send messages, photos, videos and **files** of any type (doc, zip, mp3, etc), as well as create groups for up to **200,000** people or **channels** for broadcasting to **unlimited** audiences. You can write to your phone contacts and find people by their **usernames**. As a result, Telegram is like SMS and email combined — and can take care of all your personal or business messaging needs. We also support end-to-end encrypted **voice** and **video calls**, **group calls** for up to 200 participants, and **voice chats** in groups that members can join whenever they want.

Source: https://telegram.org/faq







Source: Screenshots of Telegram iOS Client Application

101. The ’018 Accused Products comprise a system “wherein the first device includes application software for allowing the application data services, wherein the application software is branded by the provider of the application data services.” For example, Telegram includes application software (e.g., Telegram app) for allowing messaging that interfaces with the ’018 Accused Products.



Source: https://apps.apple.com/us/app/telegram-messenger/id686449807

**Q: What is Telegram? What do I do here?**

Telegram is a messaging app with a focus on speed and security, it's super-fast, simple and free. You can use Telegram on all your devices **at the same time** — your messages sync seamlessly across any number of your phones, tablets or computers. Telegram is one of the **top 5 most downloaded apps** in the world with over **1 billion** active users.

With Telegram, you can send messages, photos, videos and **files** of any type (doc, zip, mp3, etc), as well as create groups for up to **200,000** people or **channels** for broadcasting to **unlimited** audiences. You can write to your phone contacts and find people by their **usernames**. As a result, Telegram is like SMS and email combined — and can take care of all your personal or business messaging needs. We also support end-to-end encrypted **voice** and **video calls**, **group calls** for up to 200 participants, and **voice chats** in groups that members can join whenever they want.

Source: https://telegram.org/faq

102. The '018 Accused Products comprise a system "wherein an identifier associated with the first device is stored by the provider of the application data services and the provider of the mobile network, wherein the application data services are associated with the identifier; wherein the identifier is a phone number associated with the first device and the identifier is stored on the first device." For example, the phone number of a user's mobile device is stored by the '018 Accused Products, the user's mobile network provider, and the mobile device. The messaging service is associated with the phone number via the user's profile information.

**3.4. Phone Number and Contacts**

Telegram uses phone numbers as unique identifiers so that it is easy for you to switch from SMS and other messaging apps and retain your social graph. We ask your permission before syncing your contacts.

We store your up-to-date contacts in order to notify you as soon as one of your contacts signs up for Telegram and to properly display names in notifications. We only need the number and name (first and last) for this to work and store no other data about your contacts.

Our automatic algorithms can also use anonymized sets of phone numbers to calculate the approximate number of potential contacts an unregistered phone number may have on Telegram. When you open the 'Invite friends' interface, we display the resulting statistics next to your contacts to give you an idea of who could benefit most from joining Telegram.

Source: https://telegram.org/privacy

103. The ’018 Accused Products comprise a system configured to “provide the application data services to the first device through each of a Wi-Fi network and the mobile network.” For example, the ’018 Accused Products’ services including messaging and Live Location are provided through both Wi-Fi networks and mobile networks.

These parameters can also be adjusted during a conversation if there's a change in your connection. Telegram will adapt and provide excellent sound quality on stable WiFi — or use less data when you walk into a refrigerator with bad reception.

Source: https://telegram.org/blog/calls?setln=pl




Source: https://translations.telegram.org/en/ios/general/Permissions.CellularDataText.v0

104. The ’018 Accused Products comprise a system “wherein the application data services include user data generated at the first device for transmission to a second device, wherein the second device is an end user device.” For example, the ’018 Accused Products allow a user to generate a message for transmission to a second end user device.

**Q: Who can contact me?**

People can contact you on Telegram if they **know your phone number** or if you **message them first**.

If they don't know your phone number, they can find you in these cases:

- When you both are members of the **same group**.
- If you set a **public username**. Others can use **Global Search** and find you by your username.

**Q: What do the check marks mean?**

*One check* — message delivered to the Telegram cloud and your friend has been notified if he allows notifications.
*Two checks* — message read (your friend opened Telegram and opened the conversation with the message).

We don't have a 'delivered to device' status for messages because Telegram can run on as many devices as you want. So which particular one would that check mean?

Source: https://telegram.org/faq







Source: Screenshots of Telegram iOS Client Application

105. The ’018 Accused Products comprise a system “wherein the application data services are based on a location of the first device.” For example, the ’018 Accused Products allow Live Location messages which include a location of the first device.

Starting with **Telegram 4.4**, you can broadcast your current location to any chat in real time.

This is useful when you are on your way to an appointment or are trying to coordinate with friends at a large event. Instead of sending static locations on the map every minute, you can now share your **Live Location** with the people you're meeting – for **15** minutes, **1** hour, or **8** hours.

You can also share your Live Location in groups, and if other members of the group do the same, you'll get an interactive map of everyone's current coordinates. Thanks to a bar at the top of the screen, you will always remember who you're sharing your location with. And you only need two taps to stop sharing whenever you choose to.

Source: https://telegram.org/blog/live-locations







Source: Screenshots of Telegram iOS Client Application

106. The ’018 Accused Products comprise a system “wherein the location of the first device is determined based upon data provided by the first device.” For example, the ’018 Accused Products identify the location of a user’s mobile device based on data provided by the mobile device.

**3.5. Location Data**

If you share a location in a chat, this location data is treated like other messages in cloud or secret chats respectively.

If you share your Live Location in any chat or turn on *'Make Myself Visible'* in People Nearby, Telegram will use your data to display your location to those users with whom you are sharing it, even when the app is closed – for as long as you keep these optional features activated.

Source: https://telegram.org/privacy

107. The ’018 Accused Products comprise a system configured to “send the user data to the second device.” For example, the ’018 Accused Products send a user’s message with the location to the second device.

Starting with **Telegram 4.4**, you can broadcast your current location to any chat in real time.

This is useful when you are on your way to an appointment or are trying to coordinate with friends at a large event. Instead of sending static locations on the map every minute, you can now share your **Live Location** with the people you're meeting – for **15** minutes, **1** hour, or **8** hours.

You can also share your Live Location in groups, and if other members of the group do the same, you'll get an interactive map of everyone's current coordinates. Thanks to a bar at the top of the screen, you will always remember who you're sharing your location with. And you only need two taps to stop sharing whenever you choose to.




Source: https://telegram.org/blog/live-locations

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

108. In addition and/or in the alternative to the direct infringements, Telegram indirectly infringes one or more claims of the ’018 Patent under U.S.C. § 271(b) by knowingly and intentionally inducing others to directly infringe the ’018 Patent (e.g., by using ’018 Accused Products in a manner that practices one or more claims of the ’018 Patent). Such induced direct infringers include Telegram’s customers and/or other end users, as well as TMI, to the extent TMI’s infringing acts are not attributable to TGI for purposes of direct infringement.

109. At a minimum, Telegram has had knowledge of the ’018 Patent at least since service of this Complaint. Telegram also has knowledge of the ’018 Patent since receiving detailed correspondence from Lexington prior to the filing of the Complaint, alerting Telegram to its infringements. Since receiving notice of its infringements, Telegram has actively induced, and continues to actively induce, the direct infringements of its customers and/or other end users (e.g.,

as illustrated above) as set forth under U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the ’018 Patent. Indeed, Telegram has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the Accused Products, including marketing materials, user manuals, and online instructional materials (e.g., those available via https://telegram.org) that specifically teach and encourage customers and other end users to use the ’018 Accused Products in an infringing manner, including by providing instructions on how to use ’018 Accused Products. By providing such instructions and support, Telegram knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the ’018 Patent.

***Damages***

110. Lexington has been damaged as a result of Telegram’s infringing conduct described in this Count. Telegram is, thus, liable to Lexington in an amount that adequately compensates it for Telegram’s infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

111. Despite having knowledge of the ’018 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the ’018 Patent, Telegram has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Telegram’s infringing activities relative to the ’018 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of Lexington’s rights with respect to the ’018 Patent, justifying enhanced damages under 35 U.S.C. § 284.

**COUNT V**

(INFRINGEMENT OF U.S. PATENT NO. 12,432,304)

112. Lexington incorporates the preceding paragraphs herein by reference.

113. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. § 271, *et seq*.

114. Lexington is the owner of all substantial rights, title, and interest in and to the ’304 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

115. The ’304 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on September 30, 2025, after full and fair examination.

***Direct Infringement (35 U.S.C. § 271(a))***

116. Telegram directly infringes one or more claims of the ’304 Patent in this District and elsewhere in Texas and the United States under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing the Telegram communications platform, including its servers and applications providing messaging and voice calling services that incorporate the fundamental technologies covered by the ’304 Patent (collectively, “the ’304 Accused Products”).

117. Telegram directly infringes at least claim 1 of the ’304 Patent, including through TMI’s direct infringement and TGI’s direct infringement through TMI acting as TGI’s agent and on TGI’s behalf, by making, using, selling, offering to sell, and/or importing the systems claimed by the ’304 Patent.

118. By way of illustration only, Telegram’s ’304 Accused Products comprise each and every element of claim 1 of the ’304 Patent. The ’304 Accused Products comprise “[a] system having a memory and one or more processors and coupled to a mobile device on a mobile

network." For example, the '304 Accused Products have servers with memory and processor(s) that are connected to a user's mobile device and provide communication services.




Source: https://adevcan.com/privacy/telegram-review/

**3.3.1. Cloud Chats**

Telegram is a cloud service. We store messages, photos, videos and documents from your *cloud chats* on our servers so that you can access your data from any of your devices anytime without having to rely on third-party backups. All data is stored heavily encrypted and the encryption keys in each case are stored in several other data centers in different jurisdictions. This way local engineers or physical intruders cannot get access to user data.

**4.1. Storing Data**

If you signed up for Telegram from the UK or the EEA, your data is stored in data centers in the Netherlands. These are third-party provided data centers in which Telegram rents a designated space. However, the servers and networks that sit inside these data centers and on which your personal data is stored are owned by Telegram. As such, we do not share your personal data with such data centers. All data is stored heavily encrypted so that local Telegram engineers or physical intruders cannot get access.

Source: https://telegram.org/privacy

119. The '304 Accused Products comprise a system configured to "receive a unique authentication token from the mobile device." For example, the '304 Accused Products receive a unique authentication token from a user's mobile device when the user logs in to the Telegram app.

**Future auth tokens**

When invoking auth.logOut on a previously authorized session, the server may return a `future_auth_token`, which should be stored in the local database.

A `future_auth_token` is also contained in the auth.authorization returned when logging in.

At all times, the future auth token database should contain at most 20 tokens: evict older tokens as new tokens are added to stay below this limit.

When invoking auth.sendCode, all future auth tokens present in the database should be provided to `codeSettings.logout_tokens`.

If any of the future auth tokens matches the account we're trying to login into and the token hasn't expired:

- If 2FA is not enabled, auth.sendCode will directly return an auth.sentCodeSuccess constructor with session info, indicating the session is authorized.
- If 2FA is enabled, auth.sendCode will return a `SESSION_PASSWORD_NEEDED` RPC error, asking the user to enter the 2FA password, without sending any authorization code.

Source: https://core.telegram.org/api/auth#future-auth-tokens

120. The ’304 Accused Products comprise a system configured to “provide voice call and messaging services to the mobile device, wherein the voice call and messaging services are associated with the unique authentication token and branded by a first provider that is other than a provider of the mobile network.” For example, the ’304 Accused Products provide voice call and messaging services to a user’s mobile device, both of which are associated with the unique authentication token since the user must be authenticated via the token to enable the voice call and messaging services. The provider of the communications services, Telegram, is not a mobile network provider.



Source: https://apps.apple.com/us/app/telegram-messenger/id686449807

**Q: What is Telegram? What do I do here?**

Telegram is a messaging app with a focus on speed and security, it's super-fast, simple and free. You can use Telegram on all your devices **at the same time** — your messages sync seamlessly across any number of your phones, tablets or computers. Telegram is one of the **top 5 most downloaded apps** in the world with over **1 billion** active users.

With Telegram, you can send messages, photos, videos and **files** of any type (doc, zip, mp3, etc), as well as create groups for up to **200,000** people or **channels** for broadcasting to **unlimited** audiences. You can write to your phone contacts and find people by their **usernames**. As a result, Telegram is like SMS and email combined — and can take care of all your personal or business messaging needs. We also support end-to-end encrypted **voice** and **video calls**, **group calls** for up to 200 participants, and **voice chats** in groups that members can join whenever they want.

Source: https://telegram.org/faq






Source: Screenshots of Telegram iOS Client Application

121. The ’304 Accused Products comprise a system “wherein the mobile device includes application software for allowing the voice call and messaging services, wherein the application software is branded by the first provider.” For example, Telegram includes application software (e.g., Telegram app) for allowing voice calls and messaging that interfaces with the ’304 Accused Products.




Source: https://apps.apple.com/us/app/telegram-messenger/id686449807

**Q: What is Telegram? What do I do here?**

Telegram is a messaging app with a focus on speed and security, it’s super-fast, simple and free. You can use Telegram on all your devices **at the same time** — your messages sync seamlessly across any number of your phones, tablets or computers. Telegram is one of the **top 5 most downloaded apps** in the world with over **1 billion** active users.

With Telegram, you can send messages, photos, videos and **files** of any type (doc, zip, mp3, etc), as well as create groups for up to **200,000** people or **channels** for broadcasting to **unlimited** audiences. You can write to your phone contacts and find people by their **usernames**. As a result, Telegram is like SMS and email combined — and can take care of all your personal or business messaging needs. We also support end-to-end encrypted **voice** and **video calls**, **group calls** for up to 200 participants, and **voice chats** in groups that members can join whenever they want.

Source: https://telegram.org/faq

122. The ’304 Accused Products comprise a system “wherein an identifier associated with the mobile device is maintained by the first provider and the provider of the mobile network, wherein the voice call and messaging services are associated with the identifier, wherein the identifier is distinct from the unique authentication token.” For example, the phone number of a user’s mobile device is stored by both the ’304 Accused Products and the user’s mobile network provider. The voice call and messaging services are associated with the phone number via the user’s profile information wherein the phone number is distinct from the unique authentication token.

**3.4. Phone Number and Contacts**

Telegram uses phone numbers as unique identifiers so that it is easy for you to switch from SMS and other messaging apps and retain your social graph. We ask your permission before syncing your contacts.

We store your up-to-date contacts in order to notify you as soon as one of your contacts signs up for Telegram and to properly display names in notifications. We only need the number and name (first and last) for this to work and store no other data about your contacts.

Our automatic algorithms can also use anonymized sets of phone numbers to calculate the approximate number of potential contacts an unregistered phone number may have on Telegram. When you open the 'Invite friends' interface, we display the resulting statistics next to your contacts to give you an idea of who could benefit most from joining Telegram.

Source: https://telegram.org/privacy

123. The ’304 Accused Products comprise a system “wherein the system is configured to: provide the voice call services to the mobile device through each of a Wi-Fi network and the mobile network; provide the messaging services to the mobile device through each of the Wi-Fi network and the mobile network.” For example, the ’304 Accused Products’ services including voice calls and messaging are provided through both Wi-Fi networks and mobile networks.

> These parameters can also be adjusted during a conversation if there's a change in your connection. Telegram will adapt and provide excellent sound quality on stable WiFi — or use less data when you walk into a refrigerator with bad reception.

Source: https://telegram.org/blog/calls?setln=pl




Source: https://translations.telegram.org/en/ios/general/Permissions.CellularDataText.v0

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

124. In addition and/or in the alternative to the direct infringements, Telegram indirectly infringes one or more claims of the ’304 Patent under U.S.C. § 271(b) by knowingly and intentionally inducing others to directly infringe the ’304 Patent (e.g., by using ’304 Accused Products in a manner that practices one or more claims of the ’304 Patent). Such induced direct

infringers include Telegram's customers and/or other end users, as well as TMI, to the extent TMI's infringing acts are not attributable to TGI for purposes of direct infringement.

125. At a minimum, Telegram has had knowledge of the '304 Patent at least since service of this Complaint. Telegram also has knowledge of the '304 Patent since receiving detailed correspondence from Lexington prior to the filing of the Complaint, alerting Telegram to its infringements. Since receiving notice of its infringements, Telegram has actively induced, and continues to actively induce, the direct infringements of its customers and/or other end users (e.g., as illustrated above) as set forth under U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the '304 Patent. Indeed, Telegram has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the Accused Products, including marketing materials, user manuals, and online instructional materials (e.g., those available via https://telegram.org) that specifically teach and encourage customers and other end users to use the '304 Accused Products in an infringing manner, including by providing instructions on how to use '304 Accused Products. By providing such instructions and support, Telegram knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the '304 Patent.

***Damages***

126. Lexington has been damaged as a result of Telegram's infringing conduct described in this Count. Telegram is, thus, liable to Lexington in an amount that adequately compensates it

for Telegram's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

127. Despite having knowledge of the '304 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the '304 Patent, Telegram has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Telegram's infringing activities relative to the '304 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of Lexington's rights with respect to the '304 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## CONCLUSION

128. Lexington is entitled to recover from Telegram the damages sustained by Lexington as a result of Telegram's wrongful acts and willful infringements in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court.

129. Lexington has incurred and will incur attorneys' fees, costs, and expenses in the prosecution of this action. The circumstances of this dispute may give rise to an exceptional case within the meaning of 35 U.S.C. § 285, and, in such case, Lexington is entitled to recover its reasonable and necessary attorneys' fees, costs, and expenses.

## JURY DEMAND

130. Lexington hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

131. Lexington respectfully requests that the Court find in its favor and against Telegram, and that the Court grant Lexington the following relief:

(i) Judgment that one or more claims of the Asserted Patents have been infringed, either literally and/or under the doctrine of equivalents, by Telegram;

(ii) Judgment that one or more claims of the Asserted Patents have been willfully infringed, either literally and/or under the doctrine of equivalents, by Telegram;

(iii) Judgment that Telegram account for and pay to Lexington all damages and costs incurred by Lexington because of Telegram's infringements and other conduct complained of herein, including an accounting for any sales or damages not presented at trial;

(iv) Judgment that Telegram account for and pay to Lexington a reasonable, ongoing, post-judgment royalty because of Telegram's infringements, including continuing infringing activities, and other conduct complained of herein;

(v) Judgment that Lexington be granted pre-judgment and post-judgment interest on the damages caused by Telegram's infringements and other conduct complained of herein;

(vi) Judgment that this case is exceptional under the provisions of 35 U.S.C. § 285 and award enhanced damages; and

(vii) Such other and further relief as the Court deems just and equitable.

Dated: October 19, 2026

Respectfully submitted,

*/s/ Patrick J. Conroy*
**Patrick J. Conroy**
Texas Bar No. 24012448
**Ryan P. Griffin**
Texas Bar No. 24053687
**T. William Kennedy Jr.**
Texas Bar No. 24055771
**Jonathan H. Rastegar**
Texas Bar No. 24064043
**Nathan L. Levenson**
Texas Bar No. 24097992
**Brandon G. Moore**
Texas Bar No. 24082372
**NELSON BUMGARDNER CONROY PC**
2727 N. Harwood St., Suite 250
Dallas, TX 75201
pat@nelbum.com
ryan@nelbum.com
bill@nelbum.com
jon@nelbum.com
nathan@nelbum.com
brandon@nelbum.com

**Attorneys for Plaintiff Lexington Technologies, LLC**